**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Geoffrey H Slepian, | No. CV-23-08105-PCT-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Pink Jeep Tours LLC, Pink Adventure Holdings LLC, and Herschend Adventure Holdings LLC, | |
| Defendants. | |

Plaintiff Geoffrey H. Slepian worked as a guide for defendants Pink Jeep Tour Arizona, LLC and Herschend Adventure Holdings LLC (collectively "Pink Jeep"), businesses that offer guided jeep tours in Arizona. Slepian brought a complaint on behalf of himself and similarly-situated guides, claiming Pink Jeep failed to pay him minimum wage and overtime wages for time he spent waiting to be assigned to tours, preparing his jeep before and after tours, and conducting tours in violation of the Fair Labor Standards Act ("FLSA"). Slepian also alleged Pink Jeep failed to properly keep employment records. After the parties agreed to conditionally certify a collective of all current and former guides employed by Pink Jeep during a specified date range, Pink Jeep moved to decertify the collective. Because the guides are similarly-situated, Pink Jeep's motion is denied.

## I.    Background

Pink Jeep "provide[s] scenic, educational, and hopefully fun" tours in Tusayan,

near the Grand Canyon, and Sedona. (Doc. 132-2 at 5.) Pink Jeep employs two types of guides: "Jeep tour guides" and "canyon guides." (Doc. 132-2 at 4.) Some individuals work as one type but some individuals do both. (Doc. 132-2 at 4.) The claims in the present case involve only Jeep tour guides and the remainder of this order refers only to them. (Doc. 135 at 3.)

There are slight differences between the operations at Tusayan and Sedona. Tusayan guides are given the option of leasing company-owned housing across the street from the tour departure site, have mandatory break periods, and only give tours that last for part of the day. (Doc. 132-3 at 2–3.) Sedona guides are not provided company-owned housing options and do not have mandatory break periods. (Doc. 132-3 at 2–3.)

Guides are assigned tours during days they are scheduled to work. Tours are scheduled at the top of every hour and sometimes every half hour. (Doc. 132-2 at 13; Doc. 132-4 at 27.) Pink Jeep has a complicated system for assigning tours to guides that is based on each guide's position in a queue in a scheduling application called the Gantt. (Doc. 132-4 at 9.) Their position in the queue is determined by a number of factors, including how many and what type of tours have booked and the scheduled departure times. (Doc. 62-3 at 198–209.) Calculating a guide's position in the queue is so involved that Pink Jeep created a 39-page slide deck to instruct guides in analyzing the Gantt. (Doc. 62-3 at 2–40.) The guides' queue positions continually update during the day, and guides that are first or second in line for assignment are referred to as "on point." (Doc. 135-2 at 19, 31.)

Pink Jeep expects its guides to be prepared for the possibility that they could be booked for a tour every hour, so it requires them to consistently check the Gantt for changes. (Doc. 60-7 at 80; Doc. 132-2 at 9; Doc. 132-3 at 3.).) Pink Jeep instructs its guides that "regardless of status" in the queue, they are responsible for being ready to staff a tour, to "assume [they] have back to back" tours, and to "check in often" to know staffing assignments. (Doc. 60-7 at 80.) Guides that do not monitor the schedule and miss a tour assigned to them or are unavailable to take a tour by five minutes after the hour are

subject to progressive discipline under Pink Jeep's attendance policy. (Doc. 135-2 at 27.) Guides can check the Gantt on their phones or on a computer in the guide break room of the Sedona departure location. (Doc. 132-3 at 3.)

Tours are often scheduled close to the start of the tour time, sometimes within minutes of the start time. (Doc. 135-6 at 10; Doc. 135-9 at 13.) During the busy season, five or more tours can book in less than an hour. (Doc. 135-2 at 20.) Regardless, guides are required to be available for any tour that books them. (Doc. 135-2 at 10.) When a tour is scheduled to depart, the assigned guide must be at the departure location in uniform. (Doc. 132-4 at 11-12.)

Guides that are first and second on point are expected to wait at the departure sites until the start of the hour. (Doc. 60-7 at 80; Doc. 135-3 at 8–9.) Sometimes, guides are also instructed to stay on site until five to ten minutes after the top of the hour in case a tour is scheduled late. (Doc. 132-4 at 26.) Pink Jeep pays its guides for time spent giving tours but not waiting to be assigned tours unless that time is used for other discrete tasks, such as clearing trails. (Doc. 132-3 at 3.)

Guides conduct tours only after performing preparatory work, including inspecting, stocking, and relocating a jeep. (Doc. 132-3 at 3.) On days when they give tours, guides must also complete tasks at the end of their tours, such as re-fueling, cleaning, and relocating a jeep. (Doc. 132-3 at 3.) Guides are paid for a combined 90 minutes for these tasks. (Doc. 132-3 at 3.)

In June 2023, Slepian, a Sedona guide, filed his complaint alleging Pink Jeep failed to pay him and similarly-situated guides minimum wage and overtime wages for time spent waiting to be assigned to tours, preparing their jeeps before and after tours, and conducting tours, and failed to properly keep employment records in violation of the FLSA and state law. (Doc. 1.) The parties agreed to conditionally certify a collective of all current and former guides employed by Pink Jeep in Arizona going back three years from the date FLSA notice was distributed. (Doc. 29 at 2.) Slepian later moved to certify a Rule 23 class of all hourly employees who worked as guides in Arizona from June 7,

2020, but class certification was denied.[1] (Doc. 60 at 3; Doc. 84.) Pink Jeep now moves to decertify the collective pursuing claims under the FLSA. Slepian abandons his collective claims for time spent preparing the jeeps before and after tours and for conducting tours. (Doc. 135 at 2 n.1.) Thus, for purposes of the collective, Slepian only wishes to pursue "time the Guides are engaged to wait so they can staff a tour on a moment's notice and time the Guides must work checking the Gantt." (Doc. 135 at 2 n.1.)

## II.    Legal Standard

The FLSA permits plaintiffs to sue on behalf of themselves and other "similarly situated" employees. 29 U.S.C. § 216(b). To determine whether employees are similarly-situated, courts use a two-step analysis. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109–110 (9th Cir. 2018). First, courts conditionally certify collective actions that present "substantial allegations" or a "reasonable basis" that the putative collective members are "similarly situated." *Id*. at 1109. Plaintiffs that meet this "plausibility standard" notify potential collective members and give them an opportunity to opt-in. *Id*.

Second, after notice and discovery, the employer can move to decertify the collective if plaintiffs have not by then produced evidence showing the employees who opted to participate are "alike in ways that matter to the disposition of their FLSA claims." *Id*. at 1109, 1114. Such similarities must be "material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively to some resolution." *Id*. at 1115.

To the extent the decertification motion overlaps with the underlying FLSA claims, "the summary judgment standard is the appropriate one." *Id*. at 1117. Accordingly, the court must consider whether "viewing the competent evidence in the light most favorable to the nonmoving party, the trier of fact could properly find for the nonmoving party." *Id*. at 1118. "[A] district court cannot weigh the evidence, as ordinary

---

[1] The standards for class certification under Rule 23 and decertification of an FLSA collective are different. *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1115 (9th Cir. 2018) (relying on class action requirements and case law is "unwise in the collective action context").

1    summary judgment practice precludes doing so." *Id*. at 1119.

2    **III.    Compensability of Time Waiting for Assignments**

3    The first issue is whether the members of the collective are "alike in ways that

4    matter to the disposition" of Slepian's claim regarding the time spent waiting for tour

5    assignments. *Id*. at 1114. Under the FLSA, time spent "wait[ing] to be engaged" is not

6    compensable but time when an employee is "engaged to wait" is. *Owens v. Loc. No. 169,*

7    *Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992), *as amended* (Aug.

8    18, 1992) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

9    Idle time is compensable only when "the employee is unable to use the time

10    effectively for his own purposes." *Owens*, 971 F.2d at 350 (quoting 29 C.F.R. § 785.15).

11    Courts consider seven non-exhaustive factors to determine whether an employee is "so

12    restricted during on-call hours as to be effectively engaged to wait." *Id*. at 351. These are

13    whether (1) there was an on-premises living requirement; (2) there were excessive

14    geographical restrictions on his movements; (3) the frequency of calls was unduly

15    restrictive; (4) a fixed time limit for responding was unduly restrictive; (5) an on-call

16    employee could easily trade on-call responsibilities; (6) use of a pager could ease

17    restrictions; and (7) the employee could actually engage in personal activities during on-

18    call time. *Id*. No one factor is determinative. *Brigham v. Eugene Water & Elec. Bd.*, 357

19    F.3d 931, 936 (9th Cir. 2004). Courts use these factors to determine "whether [an

20    employee] is so restricted during on-call hours as to be effectively engaged to wait" or if,

21    conversely, he could use this time as his own. *Kennedy v. Las Vegas Sands Corp.*, 110

22    F.4th 1136, 1146 (9th Cir. 2024). An employee who an employer engages to wait must be

23    compensated, whereas employees who can use waiting times effectively for their own

24    purposes need not be. *Owens*, 971 F.2d at 350.

25    As best as the court can understand, Pink Jeep argues the guides are not similarly-

26    situated because they have different commute times—which led to varying abilities to

27    conduct personal activities while on call—and interpreted company staffing policies

28    differently. The parties do not address the fifth *Owens* factor, whether the guides can

1   easily trade responsibilities, so that factor does not impact the analysis. Slepian has

2   offered enough evidence showing the guides are sufficiently similar as to the other

3   factors such that proceeding as a collective is appropriate.

### a. On Premises Living Requirement and Geographic Restrictions

5   The on-premises living requirement considers whether an employee must remain

6   at or so close to the employer's premises that he cannot use waiting time for his own

7   purposes. *Owens*, 971 F.2d at 351 n.8 (citing *Armour & Co. v. Wantock*, 323 U.S. 126,

8   134 (1944)). Pink Jeep argues the Sedona and Tusayan guides were subject to different

9   on-premises living requirements and experienced different geographic restrictions based

10  on their individual circumstances. But none of the guides—whether assigned to Tusayan

11  or Sedona—were *required* to live on company premises.[2] And all guides were

12  geographically limited by Pink Jeep's requirement that they be available to staff a tour

13  with only a few minutes' notice or be subject to discipline. (Doc. 132-6 at 6.)

14  Pink Jeep argues the guides' personal interpretations of company policies resulted

15  in different geographic restrictions, highlighting that some Sedona guides testified they

16  were required to remain on company property but still left at times, others testified they

17  were sometimes required to stay on-site, and others testified they were not required to

18  stay on-site. (Doc. 132 at 11.) But Pink Jeep mischaracterizes the Sedona guides'

19  testimony. In every deposition it points to, the guides testified that although there was no

20  formal policy requiring them to remain on the premises, as a practical matter they had to

21  remain nearby company property because company policy required that they be ready to

22  staff a tour within minutes (excluding formal break times). (*E.g.*, Doc. 132-8 at 5–7

23  ("[N]o one ever told you that you had to stay" at the worksite but still "[felt] that you

24  have to stay"); Doc. 132-9 at 12 ("[T]he policy clearly states you are not required to stay

25  on the premises, but that's kind of a catch 22. If I don't stay on the premises, I might miss

26  ────────────────
    [2] Pink Jeep argues an individualized assessment is needed to determine if the Tusayan
27  guides were subject to a "practical" on-premises living requirement if they could not have
    secured transportation and housing with a reasonable commute time and the vast majority
    of Tusayan guides have lived on-premises since June 2020. (Doc. 132 at 11.)
28  Nonetheless, Pink Jeep does not require its guides to live on-premises and all guides are
    subject to the same policy. (Doc. 132-3 at 3.)

- 6 -

the tour."); Doc. 132-10 at 3, 10 (although formal policy did not require remaining at the worksite, stayed in a "two-block radius" because was "fearful that the Gantt would change" and would miss a tour); Doc. 132-11 at 5 (remained "100 square yards" from the worksite); Doc. 132-12 at 6 ("You are required to be there, not on-site, but you're required to be ready at certain times whether or not you're getting anything."); Doc. 132-13 at 3 ("I'm compelled to be there because, again, I could be punished if I miss a tour").) In light of the guides' consistent testimony, the differences Pink Jeep attempts to exploit are immaterial for purposes of the collective.

Ultimately, the Sedona guides are "alike in ways that matter to the disposition of their FLSA claims" because they were subject to the same company policies imposing de facto geographic restrictions. That is, guides were required to be available to lead a tour with only a few minutes' notice, so they couldn't go far. *See Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078, 1091 (D. Ariz. 2010) (finding employees were geographically restricted because they needed to be able to return to the worksite within a set time frame, although they were not formally required to stay).

The two Tusayan guides also testified that those on first or second on point needed to remain on company property "for that possibility of a tour at the hour or the half-hour." (Doc. 132-6 at 5.) Although company policy did not explicitly require them to remain on Pink Jeep property, the same possibility of discipline if they missed a tour applied to them as to the Sedona guides. (Doc. 132-6 at 6.) The Tusayan guides are also therefore similarly-situated as it relates to this factor.

**b. Frequency of Calls, Response Times, and Personal Activities**

Pink Jeep argues the three *Owens* factors of frequency of calls, response times, and engagement in personal activities must each be analyzed on an individual basis "in part due to extreme variation among Plaintiffs in commute times and personal tolerance for the risk of missing tours." (Doc. 132 at 12.)

The frequency of calls and response time factors attempt to measure the interaction between how often an employer needs an employee and how long an

employee may take to respond when that need arises. Employees that are needed frequently and/or must respond quickly are less likely to be able to use wait time for their own purposes. *Owens*, 971 F.2d at 351 nn. 10 & 11. Here, neither party separately addresses how frequently guides are called. (Doc. 132 at 12–14; Doc. 135 at 12–15.) But as discussed above, Pink Jeep's policies uniformly required guides to respond to staffing assignments—notwithstanding their frequency—within minutes. (*See, e.g.,* Doc. 135-6 at 10 (assigned tours "within five minutes of the start time of that tour"); Doc. 135-9 at 13 (could have "less than 10 minutes" notice before being assigned to a tour); Doc. 132-6 at 6.) Regardless of the guides' commute times and personal tolerance for risk, Pink Jeep's policies meant all guides were expected to be ready to staff a tour on short notice, sometimes with a response time of minutes or even seconds. These factors therefore cut in favor of collective certification.

The personal activities factor, in contrast, asks whether the employees "actually" engaged in personal activities. *Id.* at 351. Courts distinguish between "personal activities" and "time-filling" activities, which are done to pass time in between work assignments, rather than "personal activities [the employees] would choose to do" if they were not engaged to wait. *Gonzalez v. Tanimura & Antle, Inc*., No. CV06-2485-PHX-MHM, 2008 WL 4446536, at *12 (D. Ariz. Sept. 30, 2008); *see also Avendano v. Averus, Inc*., No. 14-CV-01614-CMA-MJW, 2016 WL 11692087, at *4 (D. Colo. Sept. 29, 2016) ("A stenographer who reads a book while waiting for dictation, a messenger who works a crossword puzzle while awaiting assignments, fireman who plays checkers while waiting for alarms and a factory worker who talks to his fellow employees while waiting for machinery to be repaired are all working during their periods of inactivity. . . the employee is unable to use the time effectively for his own purposes.") (quoting 29 C.F.R. § 785.15).

Pink Jeep argues the court must consider whether an employee can "return home while awaiting work," and points to the testimony of a Sedona guide who returned home between tours when she had a ten-minute commute. (Doc. 132 at 12 (citing Doc. 132-8 at

4, 7.) But that guide actually testified she did not feel like she had "freedom to, at any point, go home" and only went home once when she spilled something on her clothes after informing management. (Doc. 135-4 at 6–7.) Like other Sedona guides, she testified it was "not a common practice" to go home between tours because of Pink Jeep's expectations that guides be ready to staff a tour on a moment's notice when scheduled. (Doc. 135-4 at 5.)

Tusayan guides were better able to use time in between tours for personal activities because they chose to live on-site and had mandatory break periods. (Doc. 132-3 at 3; Doc. 132-7 at 4–7.) Nonetheless, whether those guides engaged in personal activities is just one of the *Owens* factors and is not alone dispositive. *Brigham*, 357 F.3d at 936.

### c.  Pager Use

The parties analogize the Gantt mobile app to a pager. (Doc. 132 at 14.) Because pagers are "obsolete" in "today's technological landscape," courts consider more generally whether "technology allows an employee to move freely and communicate with his or her employer without being tethered to a physical location." *Kennedy*, 110 F.4th at 1147. Unlike a pager, which typically enhances an employee's geographic mobility and therefore his ability to use wait time as his own, *see id.*, Pink Jeep's policies as a practical matter required guides to consistently check the Gantt throughout the day and potentially respond at a moment's notice. (Doc. 60-7 at 80.) As a result, consistent policy meant technology tethered the guides closer to Pink Jeep's worksites here rather than providing more personal freedom during wait times.

Pink Jeep argues that because some guides "elect to not use" the Gantt app—instead choosing to access it on the company break room computer—whether the app eases their restrictions is an individual question. (Doc. 132 at 14.) In effect, Pink Jeep argues different ways of accessing the Gantt create meaningful differences between collective members.

Setting aside Pink Jeep's mischaracterization of some guides' testimony, it is

undisputed guides were expected to check the Gantt "frequently." (Doc. 135-2 at 20.) Tour assignments could change within the hour and if guides failed to check every hour, they risked missing a tour and being subject to discipline. (Doc. 135-2 at 19.) Ultimately, the guides were all expected to use the Gantt, whether in the breakroom or on their phones, and it tied them to Pink Jeep's location. The guides are similarly-situated under this factor. Viewing the relevant factors together, Pink Jeep's policies and practices impacted all guides similarly such that litigating collectively is appropriate.

## IV.    Compensability of Checking the Gantt

The second theory Slepian still wishes to pursue on a collective basis is whether time spent checking the Gantt must be compensated. Pink Jeep argues that time must be adjudicated on an individual basis to determine whether it was *de minimis*. Under the FLSA, *de minimis* time spent working is not compensable and acts as a defense to liability. *Lindow v. United States*, 738 F.2d 1057, 1062 (9th Cir. 1984). "There is no precise amount of time that may be denied compensation as de minimis." *Id*. Instead, to determine whether time is *de minimis*, the court considers (1) "the practical administrative difficulty of recording the additional time"; (2) the aggregate amount of additional time worked; and (3) the regularity of the additional time worked. *Id*. at 1063.

Pink Jeep reasons the amount of time guides spend checking the Gantt qualifies as *de minimis* because the guides "spent either five, 10, or 15 minutes a day checking it." (Doc. 132 at 16.) But even if that is accurate—which the guides' consistent testimony calls into doubt (*see, e.g*., Doc. 135-3 at 5 (30 minutes a day); Doc. 135-4 at 16–17 (nine hours a week); Doc. 135-8 at 18 (three hours a week))—"claims that might have been minimal on a daily basis" can be "substantial" when aggregated. *Lindow*, 738 F.2d at 1063. And "[a]lthough it may be difficult to determine the actual time" spent checking the Gantt, it appears possible to "reasonably determine or estimate the average time." *Rutti v. Lojack Corp*., 596 F.3d 1046, 1059 (9th Cir. 2010). This would be proven, in part, by common evidence, including Pink Jeep's policies requiring guides to check the Gantt frequently so as to avoid missing tours. Accordingly, plaintiffs are similarly-

situated under this factor.

On balance, Slepian has shown the guides are similarly-situated for adjudication of a majority of the *Owens* factors and compensability of time spent checking the Gantt.

Accordingly,

**IT IS ORDERED** the Motion for Decertification of Collective (Doc. 132) is **DENIED**.

**IT IS FURTHER ORDERED** Slepian's FLSA claims for uncompensated overtime for time spent preparing jeeps before and after tours and time giving tours will not proceed on a collective basis.

**IT IS FURTHER ORDERED** the parties shall file their dispositive motions no later than sixty days after this ruling.

Dated this 11th day of June, 2025.

Honorable Krissa M. Lanham
United States District Judge